UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:19-CR-00058-RCJ-CLB |
| Plaintiff, | **ORDER** |
| v. | |
| JOSEPH GEORGE TERRONE, JR., | |
| Defendant. | |

Before the court is Defendant Joseph George Terrone, Jr.'s ("Terrone") Emergency Motion to Reopen Detention Hearing Due to the COVID-19 Pandemic. (ECF No. 19.)[1]  On January 15, 2020, Magistrate Judge William G. Cobb ordered Terrone detained pending trial. (ECF Nos. 10, 11.)  Terrone now seeks temporary release pursuant to 18 U.S.C. § 3142(i) for what he contends are compelling reasons related to the recent COVID-19 global pandemic. (ECF No. 19.)  The Government opposed the motion, (ECF No. 20), and Terrone replied. (ECF No. 21.)  The court has thoroughly

---

[1]   Before the filing of this motion, the court issued a Criminal Case Standing Order Re: Procedure for Review of Detention Orders in Light of the Coronavirus Pandemic. (ECF No. 18.)  The order required the parties to meet and confer in an effort to determine if they could stipulate to the re-opening of the detention hearing. (*Id.* at 2.)  The court has reviewed defense counsel's footnote in the motion to reopen, which discusses her failed attempt to meet and confer with government counsel.  (*See* ECF No. 19 at 1, n. 1.)  The court finds government counsel's response to defense counsel's efforts to comply with the court's ordered meet and confer inappropriate and a violation of the Local Rules.

The Local Rules for the District of Nevada define the requirements of a "meet and confer" when stated in the rules or ordered by the court. LR IA 1-3. The rules make clear that when the parties are ordered to meet and confer, both parties must attempt to meet and confer in good faith. *Id.* The refusal to speak with opposing counsel claiming to be too busy or unavailable for an indefinite amount of time (or days) does not demonstrate good faith on the part of government counsel. Government counsel is advised that any future failure to properly meet and confer when required to do so by local rule or court order will likely result in the imposition of sanctions. LR IA 1-3(3) (the failure of a party to meet and confer in good faith can result in the imposition of any sanction available under the Federal Rules of Civil Procedure, statutes or case law.)

reviewed the filings, and for the reasons stated below, the court denies Terrone's motion. (ECF No. 19.)

## I.     BACKGROUND AND PROCEDURAL HISTORY

On December 12, 2019, a federal grand jury indicted Terrone for one count of Receipt of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and for one count of Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). (ECF Nos. 1, 3.)  On January 15, 2020, Terrone was arrested in Reno, Nevada.  (ECF No. 13.)  The same day, Terrone appeared for a detention hearing before Magistrate Judge Cobb, where he was ordered detained pending trial. (ECF Nos. 10, 11.)  Terrone is currently housed at the Washoe County Detention Facility ("WCDF"), operated by the Washoe County Sheriff's Office ("WCSO"), in Reno, Nevada. (ECF No. 19 at 1.)  Terrone seeks an order for temporary release from custody for what he contends are compelling reasons—namely that the health risk to Terrone is a compelling reason to grant release. (*Id.* at 3.)  Terrone notes that correctional settings "offer no escape and little to no space for social distancing or other similar recommendations" made by experts to combat COVID-19. (*Id.*)

On March 11, 2020, the World Health Organization ("WHO") officially classified COVID-19, a disease caused by a new strain of coronavirus, as a pandemic.[2]  According to the Centers for Disease Control ("CDC"), at the time this Order was written, there were 427,460 total cases of COVID-19 in the United States, and 14,696 deaths.[3]  As of April 10, 2020, there were 2,571 positive cases of COVID-19 and 86 deaths in the State of Nevada[4], with only 315 active cases and 10 deaths in Washoe County (as of April 9,

---

[2]     *See* WHO, WHO DIRECTOR-GENERAL'S OPENING REMARKS AT THE MEDIA BRIEFING ON COVID-19, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020, (last visited Mar. 31, 2020).

[3]     *See* CDC, U.S. AT A GLANCE, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, (last viewed Apr. 10, 2020).

[4]     *See* Nev. Dept. of Health & Human Svcs., COVID-19, https://nvhealthresponse.nv.gov/, (last viewed Apr. 10, 2020).

2020)[5].  The actual number of people infected by the virus is likely much larger, given the current capacity for testing, and the rate at which COVID-19 is spreading and affecting communities around the world is alarming.[6]

The CDC identifies certain categories of individuals at a higher risk of severe illness, including older adults (65 and older) and people of any age who have serious underlying medical conditions as a higher risk for severe illness from COVID-19.[7]  The following conditions could make a person higher risk: people with chronic lung disease or moderate-to-severe asthma, people with serious heart conditions, people who are immunocompromised, including cancer treatment, people of any age with severe obesity or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, chronic kidney disease undergoing dialysis, or liver disease. *Id.*

Nevada Governor Steve Sisolak declared a State of Emergency on March 12, 2020.[8]  Schools, government agencies, casinos and nonessential businesses have closed and will continue to be closed at least through the end of April.[9]  Governor Sisolak, on April 1, 2020, issued a directive for Nevada residents to stay at home. *Id.*

The District of Nevada has also taken measures to protect the public, staff, and litigants from the risks of COVID-19. *See* Temporary General Orders 2020-02, 2020-03,

---

[5]    *See* Regional Information Center, WASHOE COUNTY COVID-19 DASHBOARD, https://gis.washoecounty.us/COVID19 (last viewed Apr. 10, 2020).

[6]    *See* New York Times, CORONAVIRUS IN THE U.S.: LATEST MAP AND CASE COUNT,  https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html,  (last viewed Apr. 2, 2020).

[7]    *See* CDC, PEOPLE WHO ARE AT HIGHER RISK FOR SEVERE ILLNESS, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html, (last viewed Apr. 2, 2020).

[8]    Associated Press, VIRUS PROMPTS NEV. GOVERNOR EMERGENCY ORDER, CANCELLATIONS (Mar. 13, 2020), https://knpr.org/headline/2020-03/virus-prompts-nev-governor-emergency-order-cancellations, (last viewed Apr. 2, 2020).

[9]    *See* Nevada Independent, SISOLAK EXTENDS COVID-19 SHUTDOWN UNTIL END OF APRIL, URGES RESIDENTS TO SHELTER-IN-PLACE, https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, (last viewed Apr. 3, 2020).

2020-04, 2020-05.  While no cases of WCDF inmates being infected have been reported, it is likely only a matter of time before that occurs.  As of April 3, 2020, three WCSO employees have tested positive for the virus, two deputies and one civilian employee.[10] WCSO immediately began working in coordination with the Washoe County Health Department to implement recommended measures, such as single point entry and screening for all employees and visitors. *Id.*  All those needing to enter WCSO for business will have their temperature taken and answer basic screening questions before admittance. *Id.*  Additionally, WCSO began instituting additional precautions such as increased medical screenings for arrestees, increased education and awareness for both inmates and staff, and increased sanitation efforts throughout the entire WCSO. *Id.*  There is no doubt the danger posed by the virus is real, with entire economies and some healthcare systems around the world collapsing or on the verge of collapsing as the world attempts to contain the virus spread.

## II.    LEGAL STANDARDS

"A person lawfully committed to pretrial detention has not been adjudged guilty of any crime.  He had only a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Bell v. Wolfish,* 441 U.S. 520, 536-37 (1979) (internal quotations omitted).  The government may detain someone on a federal offense to ensure his presence at trial and may subject him to the restrictions and conditions of detention so long as those conditions do not constitute punishment or otherwise amount to a constitutional violation. *Id.*

The Bail Reform Act ("BRA") of 1984 mandates every person charged with a federal offense be given a detention hearing. 18 U.S.C. § 3142(a).  The fundamental precept of the BRA mandates the release of individuals so long as the court can

---

[10]   *See* Regional Information Center, UPDATE FOR MARCH 28, https://www.washoecounty.us/outreach/2020/03/2020-03-28-jic-0328-update.php, (last viewed Apr. 3, 2020); UPDATE FOR APRIL 2, https://covid19washoe.com/press-release/regional-information-center-update-for-april-2/, (last viewed Apr. 3, 2020).

reasonably be assured the defendant does not pose a flight risk or danger to the community. 18 U.S.C. § 3142. To the extent that conditions, or a combination of conditions, can be fashioned to reasonably provide for such assurances, the individual must be released, as detention is "the carefully crafted limited exception." *Id.; see also United States v. Salerno,* 481 U.S. 739, 755 (1989). If the judge finds the defendant poses a danger to public safety or a flight risk, the defendant may be ordered detained. 18 U.S.C. § 3142(f).

### A. Section 3142(f) Reopening of Detention Hearing

Section 3142(f)(2) permits a judicial officer to reopen a detention hearing at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the detention hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community. Two of the detention release factors (among others) to be considered by the judicial officer are (1) the person's "physical and mental condition" (§ 3145(g)(3)(A)), and, (2) the nature and seriousness of the danger to any person or the community that would be posed by the person's release (§ 3145(g)(4)).

Courts interpret this provision strictly. *United States v. Bararia,* No. 2:12-cr-00236-MMD-GWF, 2013 WL 1907782, at *4 (D. Nev. Mar. 12, 2013); *e.g., United States v. Ward,* 63 F.Supp.2d 1203, 1206-07 (C.D. Cal. 1999); *United States v. Dillon,* 938 F.2d 1412, 1415 (1st Cir. 1991). The rule requires the movant, whether prosecutor or defendant, establish: (1) that information now exists that was not known to the movant at the initial detention hearing, and (2) the new information is material to release conditions regarding flight or dangerousness. *Id.; see also United States v. Bowens,* 2007 WL 2220501 (D. Ariz. Jul. 31, 2007) (citing *United States v. Hare,* 873 F.2d 796 (5th Cir. 1989). Generally, once a detention hearing is reopened, it is reopened to allow the court to receive any information, within reason, not submitted at the initial hearing, allowing the new

information to be considered in context. *Id.* If the information was available at the time of the original hearing, the detention hearing need not be reopened. *United States v. Turino,* 2014 WL 5261292, at *1 (D. Nev. Oct. 15, 2014) (citing *Ward,* 63 F.Supp.2d at 1206).

Courts may consider the defendant's physical ailments as a mitigating factor regarding the danger the defendant poses to society. *United States v. Adams,* 2019 WL 3037042, at *2 (D. Ore. Jul. 10, 2019). Once the defendant provides evidence regarding his or her physical health that mitigates dangerousness, the government must show through clear and convincing evidence the defendant still poses a danger to society. *Id.*; 18 U.S.C. § 3142(f)(2)(B). Release for a presumptively dangerous defendant is appropriate only when the defendant produces evidence of an extraordinary, life-threatening medical condition the jail or prison facility cannot treat and further shows the safety of the community may be reasonably assured through the conditions of release. *Id.*

Other district courts have considered COVID-19 concerns in the context of the more commonly used § 3142(f) pretrial detention framework, including the related subsections § 3142(e)(2)-(3) (statutory rebuttable presumptions) and § 3142(g) (Bail Reform Act factors). For example, the district court in *United States v. Martin,* considered the defendant's argument concerning his medical conditions (asthma, high blood pressure, and diabetes) considering the COVID-19 pandemic in a § 3142(f) analysis, holding that resolving an appeal of a detention order must be done as an individualized assessment of the Bail Reform factors. 2020 WL 1274857, at *3-4 (finding that defendant's confirmed medical conditions alone are insufficient to rebut the Government's proffer that correctional and medical staff are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus). Likewise, the district court in *United States v. Stephens,* considered speculative COVID-19 concerns in the context of a motion to reopen detention based on a change of circumstances. 2020 WL 1295155, at *2 (S.D.N.Y. 2020) (finding that "the obstacles the

current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)").  However, the court did not reopen detention based solely on COVID-19 concerns but instead relied on new information weakening the Government's case against the defendant, undermining the court's prior finding as to whether the defendant posed a danger to the community. *Id.* at *1.

**B.**    **Section 3142(i) Temporary Release of Person For Compelling Reason**

Section 3142(i) provides, in relevant part:

> "[t]he judicial officer may by subsequent order, permit the temporary release of the person, in the custody of a U.S. Marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary* for the preparation of the person's defense or *for another compelling reason.*"

§ 3142(i) (emphasis added).  A defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i). *United States v. Clark,* 2020 WL 1446895, at *2 (D. Kan. Mar. 25, 2020); *see also United States v. Buswell,* 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013) (collecting cases).  (stating that courts consider three factors related to trial preparation when considering whether pretrial release is "necessary" under § 3142(i).).

Most courts addressing a motion for temporary release under § 3142(i) have done so in the context of evaluating the necessity of the defendant assisting with preparing his or her defense. *Clark,* 2020 WL 1446895, at *2; *see, e.g., United States v. Cecerle,* 2014 WL 31674, at *4 (D. Nev. Jan. 3, 2014); *Buswell,* 2013 WL 210899, at *5; *United States v. Dupree,* 833 F.Supp. 2d 241, 247 (E.D. N.Y. 2011); *United States v. Jeffries,* 2011 WL 182867, at *4 (E.D. Tenn. Jan. 20, 2011); *United States v. Hazelwood,* 2011 WL 680178, at *3 (N.D. Ohio Feb. 16, 2011).  Courts considering whether pretrial release is "necessary under § 3142(i) have considered: (1) time and opportunity the defendant has to prepare for the trial and to participate in his defense; (2) the complexity of the case and volume of information; and, (3) expense and inconvenience associated with preparing while incarcerated. *Cecerle,* 2014 WL 31674, at *4.  This extends to the current COVID-19

pandemic inasmuch as at least one court has considered the pandemic's impact on counsel's difficulties communicating with the defendant. *See, e.g., Stephens,* 2020 WL 1295155, at *2.

Limited authority exists as to when temporary release is justified under § 3142(i) based on "another compelling reason," although a defendant's medical condition may present that compelling reason in a particular case. *See United States v. Rebollo-Andino,* 312 Fed. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142 for medical reasons). Courts typically grant relief under § 3142(i) only "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton,* 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *see e.g., United States v. Scarpa,* 815 F.Supp. 88 (E.D.N.Y. 1993) (permitting the defendant's release under the 24-hour guard of the U.S. Marshal Service at his own expense because of traumatic gunshot injury and terminal AIDS diagnosis and correctional authorities could no longer manage his medical conditions); *United States v. Cordero Caraballo,* 185 F.Supp. 2d 143, 144-47 (D.P.R. 2002) (ordering release of defendant who sustained multiple gunshot wounds, was partially paralyzed, could not walk, lost some arm function, who required the supervision of 4-5 contracted security guards on a daily basis and Bureau of Prisons could not provide required medical care).

Admittedly, courts have not previously faced the unique set of circumstances presently confronting the world as a result of COVID-19. In light of the recent COVID-19 pandemic, courts across the country have addressed, and will continue to address requests for release under § 3142(i) in the context of the pandemic, considering both the impact of the pandemic on the ability to prepare a defense, and whether the health risks posed by the pandemic constitute a compelling reason for temporary release. *See e.g., United States v. Cox,* 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Tang,* 2:20-cr-0054-KJD-DJA, ECF No. 44 (D. Nev. Mar. 23, 2020) (reopening detention but

denying temporary release under 3142(i)); *United States v. Motley,* 3:19-cr-00026-LRH-WGC, ECF No. 142 (D. Nev. Apr. 2, 2020); *United States v. Smoot*, 2020 WL 1501810 (S.D. Ohio Mar. 30, 2020); *United States v. Loveings,* 2020 WL 1501859 (W.D. Penn. Mar. 30, 2020); *United States v. Bastianelli,* 2020 WL 1493559 (W.D. Penn. Mar. 27, 2020) (citing other cases in the district); *United States v. Snowden,* 2020 WL 1492684 (S.D. Ill. Mar. 27, 2020); *United States v. Michaels,* 2020 WL 1482553 (C.D. Cal. Mar. 26, 2020); *United States v. Green,* 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020). Courts are also faced with requests for release in the context of civilly detained immigrants and convicted defendants. The court need not address those circumstances here.

## III. DISCUSSION

### A. <u>Section 3142(f) Analysis</u>

Terrone argues in his reply brief he is moving for release under both §§ 3142(f)[11] and (i); however, the opening motion does not make that clear. (ECF No. 21 at 15-16.) Instead, the motion itself contains a paragraph generally stating that the COVID-19 pandemic is a changed circumstance and then focuses mainly on § 3142(i). (ECF No. 19.) Terrone argues the circumstances existing when he was ordered detained have now changed because the COVID-19 pandemic "poses a direct risk that is far greater" than if Terrone "continues to be detained during this public health crisis." (*Id.* at 16.) Even though it is not explicitly stated, the court will address Terrone's assertion that the risk of contracting COVID-19 at WCDF constitutes a changed circumstance requiring the reopening of his detention hearing under § 3142(f).

The Government's opposition argues Terrone has cited no valid basis because there is neither an outbreak of COVID-19 at WCDF nor any indication that Terrone is particularly vulnerable to the illness compared to the general law-abiding population in the community or others in his own community at WCDF. (ECF No. 20 at 1-2.)

---

[11] While Terrone's reply brief states he is seeking to reopen detention under 18 U.S.C. § 3142(g), the court finds 18 U.S.C. § 3142(f) to be the proper basis to request a reopening of detention.

Specifically, the Government argues Terrone's concerns are speculative and generic about the potential contraction of COVID-19 at WCDF and there is no change of circumstances sufficient to undermine the court's conclusion that it cannot fashion a set of conditions to ensure Terrone will not flee these proceedings. (*Id.* at 14.)

A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. *Clark,* 2020 WL 1446895, at *3. The risk of harm to the defendant does not usually bear on this analysis; rather, whether a defendant's particular circumstances warrant release in light of the COVID-19 pandemic is more properly considered on a case-by-case basis under the "another compelling reason" prong of § 3142(i). *Id.*; *see e.g., United States v. Hamilton,* 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying temporary release based on the COVID-19 pandemic where the defendant was of advanced age and suffered from several significant health issues, with no reported incidents of COVID-19 within the facility where defendant was housed, and the Bureau of Prisons is taking "system-wide precautions" to mitigate the possibility of infection). Terrone presents generalized concerns about the risk of contracting COVID-19 at WCDF, but never cites to any evidence serving to ameliorate concerns Terrone is a flight risk and danger to the community to justify reopening detention under § 3142(f). Therefore, the court finds Terrone's concerns relating to the COVID-19 virus are more properly addressed under § 3142(i) "compelling reason" analysis.

### B.    Section 3142(i) Analysis

Terrone argues the health risk posed to him by the current COVID-19 pandemic is a compelling reason to temporarily release him. (ECF No. 19 at 3.) Specifically, Terrone notes the conditions of pretrial confinement create an ideal environment for the spread of contagious diseases, with limited intake screening procedures, limited access to personal

hygiene items, and limited medical services. (*Id.* at 7-11.) Terrone also argues WCDF's pandemic policy adjustments have impaired his ability to prepare his defense. (*Id.* at 12.)

Terrone argues incarcerated individuals are at special risk of infection given their living situation, citing confirmed outbreaks of the virus at prisons in China and Iran, (*Id.* at 8-9), and within Federal Bureau of Prisons facilities. (ECF No. 21 at 8.) Terrone notes steps being taken in some United States prisons to release elderly and sick prisoners, as well as the temporary release of some pretrial detainees and civil immigration detainees. (ECF No. 19 at 2, 9; ECF No. 21 at 8-11.) Terrone contends current screening guidelines do not go far enough because jails are visited by professionals, including healthcare workers daily, which increases the potential for spread of the virus. (ECF No. 19 at 10.) Terrone asserts COVID-19 testing is hard to come by and WCDF's housing situation, which places inmates in small cells with beds close to one another, prevents detainees from engaging in CDC-recommended social distancing and self-quarantine. (*Id.* at 10-12.) Terrone cites the sharing of limited toilets, sinks and showers, movement restrictions, and limited access to personal hygiene items as precluding detainees from taking recommended precautions. (*Id.*) Terrone provides he is amenable to home confinement in Reno with his friend, Charlotte Meyers, and location monitoring, in conjunction with any other conditions this court would like to impose but lists no further release plan and lists no acceptable conditions of release should the court deem temporary release appropriate. (*Id.* at 17.)

The Government disagrees with Terrone, arguing no compelling reason exists for his temporary release. (ECF No. 20.) The Government notes Terrone cited no valid basis for release because there is neither a COVID-19 outbreak at WCDF nor any indication that Terrone is particularly vulnerable to the illness compared to the general law-abiding population in the community or others in his own current community at the WCDF. (*Id.* at 1-2.) The Government asserts the essence of Terrone's argument relies on the mere possibility he will become infected with COVID-19 by someone else at the facility, but

Terrone has not demonstrated that his risk of contracting COVID-19 while in custody is significantly higher than if he were to be released nor has Terrone shown he is at high risk to become severely ill in the event he does contract the virus. (*Id.* at 6-8.)  The Government argues Terrone also failed to demonstrate that WCDF is unequipped to provide appropriate medical treatment if he were to become sick. (*Id.* at 6-7.)

The Government notes CDC guidelines provide that older adults (65 years and older) are at higher risk for severe infections, but Terrone is only 50 years old, over a decade younger than the identified CDC group.  The Government also notes Terrone does not argue he has any specific, high-risk underlying health conditions that put him at an increased risk for severe illness, and provides no medical documentation for the court to assess the manner in which COVID-19 could impact his health. (*Id.* at 7-9.)  Finally, the Government argues to the extent Terrone is at an increased risk of contracting the virus while detained, so are all other detainees. (*Id.* at 9.)  The Government asserts if this increased risk is the compelling reason justifying release, then all detainees need to be released. (*Id.*)

Terrone's reply reiterates his argument that WCDF is not adequately equipped to manage COVID-19, and the public health crisis stemming from the pandemic is a compelling reason for temporary release or a changing circumstance warranting reopening of detention. (ECF No. 21.)  Finally, Terrone reasserts his argument that release is necessary for preparation of his defense because of COVID-19. (*Id.* at 16-17.)

The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents, particularly within the jail and prison setting.  The CDC notes that "[c]orrectional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting.  The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and

visitors."[12]  The CDC cautions "once community transmission is identified in a particular area," as it has been in Washoe County, "correctional facilities and detention centers are more likely to start seeing cases inside their walls." *Id.*  The CDC provided interim guidance for steps correctional and detention facilities should take in preparation, prevention and management to help reduce the risk of transmission and severe illness from COVID-19. *Id.*  The CDC recommends facilities establish policies, procedures and protocols related to: operational and communications preparation; enhanced cleaning, disinfecting and hygiene practices; social distancing strategies to increase space between individuals in the facility; limiting transmission from visitors; infection control, including recommended personal protective equipment and alternatives if a shortage occurs; screening for incoming incarcerated or detained individuals, staff and visitors; medical isolation for confirmed and suspected cases and quarantine of contacts; healthcare evaluation for suspected cases, including testing measures; clinical care for confirmed and suspected cases; and considerations for persons at higher risk of severe infection. *Id.*

Nevertheless, in this context, a defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation. *Clark,* 2020 WL 1446895, at *3.  Instead, the court must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary. *Id.*  The court will evaluate the four following factors: (1) the original grounds for the defendant's pretrial detention; (2) the specificity of the defendant's stated COVID-19 concerns; (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that the defendant's proposed release would increase

---

[12]  *See* CDC, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, (last viewed Apr. 3, 2020).

COVID-19 risks to others. *Id.* The court will not necessarily weigh these factors equally but will consider them in their entirety to determine whether a "compelling reason" exists such that temporary release is necessary. *Id.*; § 3142(i).

### 1. *The Original Grounds for the Defendant's Pretrial Detention*

The court first considers the original grounds for the defendant's pretrial detention. *Id.*; *see also Hamilton,* 2020 WL 1323036, at *1-2 (first considering the rebuttable presumption under § 3142(e) before considering whether the COVID-19 pandemic warranted temporary release under § 3142(i)); *Bararia,* 2013 WL 1907782, at *1-2 (considering the circumstances leading to the defendant's revocation of pretrial release); *Buswell,* 2013 WL 210899, at *5 (observing that "the facts surrounding the underlying reasons for the defendant's detention are relevant to the [§ 3142(i) ] analysis").

A defendant seeking temporary release under § 3142(i) has already been determined by a court that pretrial detention was warranted on the grounds that no condition or combination of conditions would reasonably assure defendant is not a flight risk and/or not pose a risk of harm to others. *Clark,* 2020 WL at 1446895, at *3. Accordingly, the court takes into consideration whether the defendant has presented such compelling reasons that effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order. *Id.*

Here, Judge Cobb ordered Terrone detained pending trial based on a finding that the Government had proved by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure Terrone's appearance as required. (ECF No. 10.) After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the court concluded Terrone posed a risk of nonappearance, specifically noting Terrone's lack of stable employment, lack of stable residence, lack of financially responsible sureties, and background information unknown or unverified. (*Id.* at 2-3.) Additionally, because Terrone is charged with Receipt

of Child Pornography, a violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), there is a rebuttable presumption of detention.  18 U.S.C. § 3142(e)(3)(E).

While Terrone claims he is amenable to home confinement with a friend and location monitoring, along with other conditions determined by the court, he does not present any evidence to override or counterbalance the original determination that conditions, including the conditions he presently proposes, would not reasonably assure his appearance at trial. (*See* ECF No. 19 at 17.)  Terrone's charges carry a presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E).  In addition, the grand jury found probable cause to believe Terrone engaged in the alleged criminal conduct.  Terrone provides no new information to overcome the court's initial detention order, and in fact, has already demonstrated unwillingness to comply with community standards through his actions giving rise to this case and the incident surrounding his eventual arrest. Specifically, the Government notes that Homeland Security Investigation Special Agent Lesley Hill ("SA Hill"), who conducted much of the investigation in this case, was able to contact Terrone prior to serving the arrest warrant and Terrone agreed to turn himself in to SA Hill. (ECF No. 20 at 3.)  However, Terrone never showed up and did not contact SA Hill.  (*Id.*)  SA Hill was unable to locate Terrone.  (*Id.*)  It was determined that during that time, Terrone moved out of his apartment to flee law enforcement.  (*Id.*)  The United States Marshals Service initiated a fugitive search but had difficulty locating Terrone because in addition to moving out of his apartment, he sold his vehicle, and quit his job. (*Id.*) Therefore, Terrone has not presented any evidence to alleviate the court's concerns that he remains a flight risk and there are no conditions that could be fashioned to reasonably assure his appearance at trial.  Thus, this factor weighs against Terrone's temporary release.

### 2.     *The Specificity of the Defendant's Stated COVID-19 Concerns*

The court turns next to the defendant's stated COVID-19 concerns. *Clark,* 2020 WL at 1446895, at *4.  Terrone raises only generalized concerns regarding the impact

COVID-19 may have on him if he continues to be detained during this pandemic. Terrone asserts generalizations regarding prisons and detention facilities being at higher risk for an outbreak and presents conclusory assertions that the WCDF and WCSO are not adequately prepared to prevent an outbreak, and unprepared to manage an outbreak once the virus enters the facility. Terrone also contends he is at a greater risk of contracting COVID-19 given the lack of opportunity for social distancing at WCDF. Preliminarily, Terrone admits he is unaware of known inmate cases of COVID-19 at WCDF, and he presents no evidence that he is at higher risk for severe illness should he contract the virus. Terrone, at 50 years old, is well outside the CDC's indicated high-risk age range, and he does not provide evidence of any serious underlying medical conditions putting him at risk of severe illness.

It is undisputed that the CDC recommends avoiding crowds and social distancing to reduce the risk of transmission.[13] On March 29, President Trump extended social distancing guidelines, which recommend avoiding social gatherings of ten or more people through at least the end of April, perhaps longer.[14] As noted above, Nevada's Governor issued a directive for all Nevadans to stay at home and extending social distancing practices for the same time period.

WCDF is reportedly taking reasonable recommended precautions, including having medical staff screen inmates during intake for COVID-19 risk, isolating those deemed to be high risk, and promoting other recommended hygiene habits. (*See* ECF No. 19-1). WCDF is implementing CDC and WHO guidelines, purchasing COVID-19 test kits, communicating best practices for personal hygiene to prevent the spread, encouraging employees to stay home if they are ill, and developing plans to separate

---

[13] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html (last visited Mar. 26, 2020) (setting forth steps to reduce the risk of transmission).

[14] *See* New York Times, TRUMP EXTENDS SOCIAL DISTANCING GUIDELINES THROUGH END OF APRIL, https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html, (last visited Apr. 3, 2020).

high-risk individuals who are more susceptible to COVID-19. (*See id.*)  Further, in the event an inmate becomes too ill to be cared for within the detention center, the inmate will be transported to a local medical facility for treatment. (*Id.* at 10.)  WCDF also changed visitation policies to suspend social visits and minimize in-person legal visits. [15]  In order to allow WCDF inmates access to families during the pandemic, WCSO set up "virtual visitations" through the internet and provides free phone calls for all inmates.  *Id.*  Even despite the recent news of WCSO employees testing positive for COVID-19, there remains no indication that any WCDF inmate has been affected.

Terrone supports his argument by stating individuals who are not symptomatic or have unknowingly been exposed will bring the virus into the WCDF. (ECF No. 19 at 4.)  While it is true infected persons may not show symptoms until between two to fourteen days after exposure, and some percentage of infected persons may be asymptomatic or show very mild symptoms, that is also the case outside of WCDF.[16]  Terrone further argues that COVID-19 testing is not available for WCDF inmates. (ECF No. 19 at. 12.)  Even if the facility does not have COVID-19 testing available, this is an ongoing problem that is not unique to prison and jail systems.[17]  Terrone's reply brief points to Magistrate Judge Weksler's order in *United States v. Cox,* 2020 WL 1491180, at * 4, (D. Nev. Mar. 27, 2020), stating that "[g]iven the medical obstacles identified by major cities, it is doubtful that Southern Nevada Detention Center and the hospital at Pahrump will fare better than hospitals in New York or California." (ECF No. 21 at 2, n. 1.)  The court acknowledges the

---

[15]    *See* Washoe County Sheriff's Office, COVID-19 UPDATE, https://www.washoesheriff.com/resources/files/COVID-19%20Backup%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.pdf (last viewed Mar. 27, 2020).

[16]    *See,* CDC, SYMPTOMS OF CORONAVIRUS, https://www.cdc.gov/coronavirus/ 2019-ncov/symptoms-testing/symptoms.html, (last viewed Apr. 3, 2020); New York Times, INFECTED BUT FEELING FINE: THE UNWITTING CORONAVIRUS SPREADERS, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html, (last viewed Apr. 3, 2020).

[17]    *See, e.g.,* Robert Kuznia, et al, SEVERE SHORTAGE OF SWABS AND OTHER SUPPLIES HAMPER CORONAVIRUS TESTING, https://www.cnn.com/2020/03/18/ us/coronovirus-testing-supply-shortages-invs/index.html (last visited Mar. 26, 2020).

great difficulties encountered by local hospitals and medical centers in detention and correctional facilities during this pandemic. However, those difficulties are faced around the world; the strain on healthcare resources exists nationwide and statewide.[18] The court also notes Judge Weksler denied Cox's motion seeking release. *Cox,* 2020 WL 1491180, at *7.

In sum, Terrone presents no specific COVID-19 risk factors and his arguments are too speculative or generalized to favor release. Terrone cannot predict the extent to which COVID-19 cases might arise at WCDF any more than many Americans can predict how they might be exposed to the virus. Terrone also cannot predict how WCSO might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond. While inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to Terrone. WCDF staff and medical personnel have prepared for very likely possibility of an infected person entering the jail and instituted standard practices and procedures to screen, separate, or quarantine individuals as necessary in same manner as being done in the general Northern Nevada community. The court therefore finds Terrone's concerns about WCDF to be unsupported. Thus, this factor weighs against release.

### 3. *The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall COVID-19 Risks*

The Bail Reform Act allows for temporary release only if the court determines such release is "necessary" for a compelling reason. 18 U.S.C. § 3142(i). In the context of COVID-19, this means the proposed temporary release plan should be tailored to mitigate the defendant's overall COVID-19 risks, not exacerbate them. *Clark,* 2020 WL at 1446895, at *6. Thus, the court evaluates the extent to which a defendant's proposed

---

[18]  *See, e.g.,* Nevada Dept. of Public Safety, COVID-19 PANDEMIC SITUATION REPORT, https://nvhealthresponse.nv.gov/wp-content/uploads/2020/03/3.25.20-Sit-Rep.pdf (last visited Mar. 26, 2020).

release plan mitigates or exacerbates the defendant's overall COVID-19 risk. *Id.*

Here, Terrone's proposed release plan includes home confinement at his friend's residence at an unspecified location "in the Reno area", and location monitoring. (ECF Nos. 19, 21.) Terrone's plan does not address all aspects of public health officials' recommendations and does not address other risk factors that would arise if Terrone were released from custody. (*Id.*) Terrone has not set forth a record establishing that, even if someone at WCDF were to contract COVID-19, WCSO is unprepared to contain the virus or care for those who may become infected. To the contrary, WCSO established a comprehensive plan to manage WCDF during the pandemic. (ECF No. 19-1.) The record is void of information suggesting WCDF would be unable to render appropriate medical treatment to Terrone if he became ill. Thus, Terrone's unexplained, conclusory allegations regarding WCDF's inability to manage the care of inmates during the pandemic does not rise to the level of justifying temporary release based on COVID-19 concerns.

Terrone proposes to live with his friend and home confinement, along with any further conditions the court deems appropriate. (ECF Nos. 19, 21.) Terrone does not address the extent to which his risks could be exacerbated if he is temporarily released to his friend's residence in some undisclosed location. (*Id.*) Terrone offers no evidence to explain how temporary release mitigates the risk of infection. For example, he does not identify the age or risk factors of his friend, or explain or identify who else has or will live in or frequent the home or any screening practice or concrete COVID-19 precautions taken there. Terrone therefore offers nothing more than mere speculation that temporary release would be less risky than living in close quarters with others at WCDF, which at least has screening practices and other reasonable COVID-19 precautions in place.

Terrone also does not address the risk of exposure while en route from WCDF to his friend's residence, at an unspecified location. Terrone does not address, once there, how the limited capacity of the unspecified area's health care system will provide him with

any different adequate treatment outside WCDF if Terrone were to contract the virus.  In contrast, if Terrone remains at WCDF, he has access to medical care should he become ill.  WCSO, as operator of WCDF, collaborates with the county and state health agencies and others to keep its employees and those in its care safe and healthy.  WCSO has ample motivation to prevent any outbreak at WCDF and, even if an outbreak occurs, to contain and manage it for the well-being of all involved.

On balance, the court is persuaded this factor weighs against temporary release because there is insufficient evidence presented and it is speculative to predict whether Terrone is safer in terms of his overall COVID-19 risks at WCDF or temporarily released from custody to live with his mother or sister at an unspecified location.

### 4. *The Likelihood that Defendant's Proposed Release Plan Would Increase COVID-19 Risks to Others*

In considering temporary release under § 3142(i) based on circumstances related to COVID-19, it is also appropriate to consider the likelihood the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. *Clark,* 2020 WL at 1446895, at *7.  A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if the defendant is taken back into custody. *Id.*

In this case, these considerations do not support release.  The court originally detained Terrone because he was a risk of flight, as discussed above.  Given the § 3142(f) and (g) considerations discussed previously, the court believes Terrone will likely violate any conditions of release the court may impose if the court were to issue a temporary release order and Terrone has failed to produce new evidence proving otherwise.  Terrone proposes home confinement and location monitoring, along with any further conditions the court deems appropriate. (ECF Nos. 19, 21.)

As another court recently observed, "[w]hile the location monitoring that [defendant] proposed may offer useful information about where he is, it provides little useful information about what he is doing." *Martin,* 2020 WL 1274857, at *4. Through the actions leading up to his eventual arrest, Terrone has shown a lack of ability to comply with law enforcement. The court has no reason to believe he would suddenly become compliant now.

Furthermore, supervising a high-risk offender out in the community will place pretrial services officers at a heightened risk of contracting the virus. Terrone seeks release at a time when Pretrial Services Officers across the country are teleworking in shifts and seeking to minimize physical contact with defendants to reduce the risk of viral transmissions. The court finds this is a significant disadvantage when seeking to monitor defendants requiring intense supervision, as Terrone would require.

Finally, Terrone proposes being released to home confinement with his friend at an unspecified location "in the Reno area." (ECF No. 19, 21.) Terrone provides no information relating to the age and/or underlying health conditions of his friend or others who may be in the same location, and therefore, the court does not have sufficient information to determine whether temporary release would go against current CDC guidance recommending limiting in-person contact individuals with high-risk health conditions. Therefore, this factor weighs against temporary release. In conclusion, Terrone has not met his burden of demonstrating the health risks posed by COVID-19 are a compelling reason justifying temporary release under § 3142(i).

### C. Necessary for Preparation of Defense

Terrone also argues temporary release is necessary for the preparation of his defense. (ECF Nos. 19, 21.) His attorney states it is "unwise" to visit a client at WCDF during the COVID-19 pandemic because counsel may unknowingly expose Terrone to the virus. (ECF No. 19 at 12.) Terrone additionally asserts there are limited means for contact visits at WCDF. (*Id.*)

The Government argues Terrone has not shown contact visits are necessary to prepare his defense, and that release would not necessarily improve his access to his attorney. (ECF No. 20 at 12.) The Government asserts other limitations are not impeding Terrone's ability to meet and confer with attorneys, defense investigators and experts through WCDF's video conference calls. (*Id.*)

Courts considering whether pretrial release is necessary for a person's defense under § 3142(i) consider: "(1) the time and opportunity the defendant has to prepare for the trial and participate in his defense; (2) the complexity of the case and volume of information; and (3) expense and inconvenience associated with preparing while incarcerated." *Cecerle,* 2014 WL 31674, at *4. However, these typical considerations are not necessarily relevant to claims made by defendants seeking release due to COVID-19 concerns.

WCDF has limited in-person visitation at the jail and provided for teleconferencing and telephone communication with legal representatives and visitors during the COVID-19 pandemic. Terrone will still have access to his attorney while detained during the pandemic through these means. Even outside WCDF, while law firms are deemed "essential businesses" in Nevada and may still operate, they are supposed to follow strict social distancing guidelines. Attorneys and clients outside of the correctional/detention setting are also utilizing telephone and videoconferencing as their primary modes of communication. Terrone has a constitutional right to unmonitored calls or videoconferencing with his counsel from WCDF, and he provides no evidence showing WCDF has violated that right.

Terrone does not present a declaration from counsel indicating the frequency of attorney-client visits before the pandemic or stating why counsel cannot adequately prepare for trial utilizing telephonic and videoconferencing communications methods. While counsel may believe her ability to effectively represent Terrone due to limitations on alternative communication access, the court reiterates the fact we are currently living

in unprecedented times, with even the court system having to change and adapt with the current limitations. (ECF No. 19 at 10.)  Even if Terrone were to be temporarily released to live with his friend, at an unspecified location, presumably in Northern Nevada, given the current shelter-in-place directive issued by Governor Sisolak, it is unlikely Terrone would be able to have in person meetings with his counsel or have access to any type of videoconferencing.  Therefore, Terrone's ability to communicate with counsel during the pandemic may be greater while he is housed at WCDF.

The court does not find Terrone's temporary release is necessary for the preparation of his defense.  The court is sympathetic to the circumstances surrounding Terrone's ability to communicate with counsel during the pandemic while housed at WCDF, but to the extent these limitations exist while he is detained, they will almost certainly exist if he is released.  Therefore, this factor also weighs against temporary release.  Thus, considering all the facts before the court at this time, the court does not find Terrone's temporary release is necessary to prepare his defense.

**D.    Due Process Clause Argument**

Finally, Terrone advances another argument based on constitutional protections of pretrial detainees under the Due Process Clause of the Fifth Amendment. (ECF No. 19.)  Terrone argues under the Fifth Amendment, pretrial detainees may not be punished. (*Id.* at 13.)  Terrone asserts if the pretrial detainee's conditions of confinement are not reasonably related to a legitimate goal (i.e., if they are arbitrary or purposeless), then the court may infer that the purpose of the government action is punishment, which is prohibited. (*Id.* at 13.)  Terrone also notes pretrial detainees have a substantive due process interest in freedom from deliberate indifference to their medical needs and a right to adequate medical care. (*Id.* at 13-15.)

The Government opposes Terrone's motion for temporary release arguing that Terrone's continuing detention does not violate his due process rights. (ECF No. 20.)  Specifically, the Government asserts Terrone's motion does not allege that the

Government has an express intent to punish him, and that preventing a defendant from absconding and ensuring that he appear for trial and sentencing is a legitimate governmental objective. (*Id.* at 11.) The Government notes Terrone's current confinement does not appear excessive in relation to the government's reasonable objective of ensuring his trial appearance, and Terrone does not cite to authority under which the fact of detention itself becomes an excessive or unreasonable condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19. (*Id.*)

In evaluating whether a condition of pretrial detainment violates the Fifth Amendment, the question is whether the condition amounts to punishment. *Bell,* 441 U.S. at 535. The United States Supreme Court stated,

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539; *see also Demery v. Arpaio,* 378 F.3d 1020, 1028 (9th Cir. 2004) (applying same rule). Thus, the question before this court is whether Terrone's detention is reasonably related to a legitimate government objective.

The court finds Terrone's detention is reasonably related to the legitimate government interests of protecting the community and ensuring his appearance at trial. At Terrone's detention hearing, Judge Cobb detained him finding that he posed a flight risk and that no condition or combination of conditions of release would reasonably assure Terrone's appearance as required. (*See* ECF No. 10, 11.) Terrone does not argue that any of the § 3142(g) factors have changed. Accordingly, the court finds Terrone's detention remains reasonably related to the above stated legitimate government interests.

The recent COVID-19 pandemic does not change the analysis for Terrone under the Fifth Amendment's Due Process Clause. Terrone's argument, that the COVID-19

pandemic presents a significant risk of harm that outweighs the government's interest in confinement, improperly suggests a balancing test applies. (*See* ECF No. 19.) As previously discussed, the Fifth Amendment's Due Process Clause simply asks whether the pretrial detainment is reasonably related to a legitimate government interest. *Bell,* 441 U.S. at 539. Here, it is.

Finally, Terrone notes pretrial detainees have a legal right to adequate medical care. (ECF No. 19 at 13-14.) Terrone does not provide much analysis on this point or explain how this right justifies his release in this case. Terrone argues "there is no greater necessity than keeping a defendant alive" and points to his argument that detention centers are particularly susceptible to the spread of communicable diseases despite protective measures. (*Id.* at 14-15.) However, Terrone's statement is conclusory and unsupported by any evidence as to how WCDF has not provided adequate medical care to Terrone or what his current medical needs are. Therefore, the court will not grant Terrone temporary release on this basis.

## IV. CONCLUSION

On balance, Terrone has not set forth new information to override or counterbalance the court's concerns identified when making the decision to detain pending trial. Nor has Terrone met his burden of demonstrating a compelling reason justifying temporary release, any type of Due Process consideration, nor that the circumstances of the COVID-19 pandemic necessitate temporary release to prepare his defense. To the contrary, it appears if Terrone were released, he would simply be trading one set of problems for another. Additionally, Terrone's proposed release plan would place pretrial services officers at risk in supervising him, and when the temporary release inevitably ends, other law enforcement officers and the facility would be placed at risk in re-apprehending Terrone after having ample opportunity for contamination. Therefore, Terrone has not established a compelling reason that temporary release is necessary.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Temporary Release (ECF No. 19) is **DENIED**.

**IT IS SO ORDERED.**

**DATED**:  April 10, 2020.

_____
UNITED STATES MAGISTRATE JUDGE